## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CONDADO PLAZA ACQUISITION LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROK ACQUISITIONS LLC; FLAMBOYAN HOTEL LLC; CONDADO PLAZA INVESTMENTS LLC; ROK CPH OCEAN PR LLC; ROK CPH LAGOON PR LLC; CPH OCEAN LLC; CPH LAGOON LLC; CPH FLAMBOYAN LLC; SERGIO ROK; MICHAEL SPERLING; MARK BEREZDIVIN; AND JEFF BEREZDIVIN, <br><br> Defendants. | Case No. <br><br> Re: <br><br> *Culpa In Contrahendo*; Industrial and Trade Secret Act of Puerto Rico; Unfair Competition and General Tort Liability <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW plaintiff Condado Plaza Acquisition LLC ("Plaintiff" or "CP Acquisition"), through the undersigned attorneys, and respectfully states, alleges, and prays as follows:

### I.   NATURE OF THE ACTION, JURISDICTION, AND VENUE

1.      This is a civil action based on the *culpa in contrahendo* doctrine; for breach of the Industrial and Trade Secret Act of Puerto Rico; and for unfair competition and general tort liability under Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, inasmuch as there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.     The Court has personal jurisdiction over the defendants and venue is proper under 28 U.S.C. § 1391(b) because this lawsuit arises out of, and is connected with, the purposeful acts committed by the defendants in the Commonwealth of Puerto Rico. Specifically, and without limitation, the defendants pursued a business venture and tried to take advantage of the laws of the Commonwealth of Puerto Rico, have executed a contract to acquire a property in Puerto Rico, and substantial part of the events giving rise to the claims occurred in this judicial district.

## II. THE PARTIES

4.     Plaintiff Condado Plaza Acquisition LLC ("CP Acquisition") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 1350 Broadway, New York, New York 10018. For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of its members. *See Pramco, LLC ex rel CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1st Cir. 2006). The sole member of Plaintiff is Platinum Capital Partners, Inc., a company incorporated and existing under the laws of the British Virgin Islands, with principal place of business in Cyprus and the British Virgin Islands.

5.     Defendant ROK Acquisitions LLC ("ROK") is a limited liability company organized and existing under the laws of the State of Florida, with principal place of business at 48 East Flagler Street, PH-105, Miami, Florida 33131. Upon information and belief, ROK is a citizen of the State of Florida for purposes of diversity jurisdiction since, upon information and belief, all of its members are citizens of that state. ROK may be served with process via its registered agent, Daniel Moskovitz, 48 East Flagler Street, PH-104, Miami, Florida 33131.

6.     Defendant Flamboyan Hotel LLC ("Flamboyan Hotel") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with

principal place of business at: 598 A Street, Suite 2, San Juan, Puerto Rico, 00918. On information and belief, Flamboyan Hotel is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. Flamboyan Hotel may be served with process via its registered agent here in Puerto Rico.

7.      Defendant Condado Plaza Investments LLC ("Condado Plaza Investments") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, Condado Plaza Investments is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. Condado Plaza Investments may be served with process via its registered agent here in Puerto Rico.

8.      Defendant ROK CPH Ocean PR LLC ("ROK CPH Ocean") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, ROK CPH Ocean is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. ROK CPH Ocean may be served with process via its registered agent here in Puerto Rico.

9.      Defendant ROK CPH Lagoon PR LLC ("ROK CPH Lagoon") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, ROK CPH Lagoon is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. ROK CPH Lagoon may be served with process via its registered agent here in Puerto Rico.

10.     Defendant CPH Ocean LLC ("CPH Ocean") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, CPH Ocean is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. CPH Ocean may be served with process via its registered agent here in Puerto Rico.

11.     Defendant CPH Lagoon LLC ("CPH Lagoon") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, CPH Ocean is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. CPH Lagoon may be served with process via its registered agent here in Puerto Rico.

12.     Defendant CPH Flamboyan LLC ("CPH Flamboyan") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico with principal place of business at: 598 A Street No. 2, San Juan, Puerto Rico, 00918. On information and belief, CPH Flamboyan is a citizen of the State of Florida for purposes of diversity jurisdiction since its sole member, ROK, is a citizen of that state. CPH Flamboyan may be served with process via its registered agent here in Puerto Rico.

13.     Defendant Sergio Rok is a resident and citizen of the State of Florida. Upon information and belief, he is the managing member of ROK and a member of ROK CPH Lagoon. His known address is: 48 East Flagler Street, PH-105, Miami, Florida 33131.

14.     Defendant Michael Sperling is a resident and citizen of the State of Florida. Upon information and belief, he is a member of ROK and of ROK CPH Ocean. His known address is: 48 East Flagler Street, PH-105, Miami, Florida 33131.

15.     Defendant Mark Berezdibin is a resident and citizen of the Commonwealth of Puerto Rico. Upon information and belief, he is a member of Flamboyan Hotel. His known business address is: 598 A Street No. 2, San Juan, Puerto Rico, 00918.

16.     Defendant Jeff Berezdibin is a resident and citizen of the Commonwealth of Puerto Rico. Upon information and belief, he is a member of Flamboyan Hotel, of Condado Plaza Investments, of CPH Flamboyan, and of CPH Ocean. His known business address is: 598 A Street No. 2, San Juan, Puerto Rico, 00918.

### III. FACTS RELEVANT TO ALL CAUSES OF ACTION

17.     As of December 10, 2020, Posadas de Puerto Rico Associates LLC ("Posadas") was the owner of two parcels of land in the Condado area of San Juan (Parcels A and B), wherein The Condado Plaza Hilton hotel (hereinafter, the "Hotel") is located.

18.     Parcel A consists of property 15,626 registered at page 40, volume 406 of the Santurce North Property Registry, Section I of San Juan, and whose record entry reads as follows:

> URBAN: Tract of land located at Ashford Avenue Number 999 at Condado Ward Santurce, Puerto Rico, comprising an area of 15,141.1122 square meters, equivalent to 3.8523 cuerdas, equivalent to 1 hectare, 51 areas, 41 centiareas and 1122 milliareas, bounded on the NORTH, with the Maritime zone of the Atlantic Ocean; by the SOUTH, its front with the exterior border of the sidewalk of Ashford Avenue, representing the boundary of the right of way of said street; by the EAST, with land property of Miramar City Corporation, and by the WEST, with the Maritime Zone of the Condado Lagoon Public Beach.
>
> On said premises there was constructed a certain building for the purpose of operating a tourist hotel, described as follows: Multi story reinforced

> concrete building designed as 320 room hotel, consisting of approximately 5,700 square feet with a casino and swimming pool, in accordance with preliminary plans and specifications prepared by Basora and Meléndez Architects. This description corresponds to capacity measurement and rectification, as per public deed #5 subscribed in San Juan on January 26, 1982 before the notary Silvestre M. Miranda, registered at the Margin of page 209 vto., of volume 774 of Santurce South, property #15626.

19.     Parcel B consists of property 17,286 registered at page 218, volume 462 of the Santurce North Property Registry, Section I of San Juan, and whose record entry reads as follows:

> URBAN: Parcel of land located in a place named El Condado, of the North Section of the Santurce Ward of this city San Juan, Puerto Rico, with a superficial area of 4778.6432 square meters, bounded by the NORTH: in a distance of 82.50 meters, fronted by, Dr. Ashford Avenue, formerly known as Las Nereidas Avenue; SOUTH: bounded on the rear by, an irregular line with a total distance of 97.69 meters, with the Ensenada or Condado Lagoon; WEST: with land property of Luis Tirado formerly the Behn Brothers, in a distance of 44.88 meters; EAST: in a distance of 61.62 metros, with land property of John Rodriguez de Jesus formerly the Estate of Francisco Maria Franceschi then Jacks Beach Resort Incorporated.

20.     On or around September 2019, CP Acquisition and Posadas began negotiations for CP Acquisition to acquire the Hotel and all assets related to its operation from Posadas. From the inception of their negotiations, CP Acquisition made it clear to Posadas that the only way the deal would make economic sense to CP Acquisition was if the Hotel was a viable going concern and had substantial goodwill. Posadas affirmatively represented to CP Acquisition that the Hotel was a viable going concern and had substantial goodwill by providing, *inter alia*, an Offering Memorandum detailing the Hotel's actual and projected revenues and operations.

21.     It was always CP Acquisition's intention to obtain debt financing or bring in co-investors into the deal with Posadas – a fact that Posadas was aware of. Thus, on or about October 2019, Posadas' real estate broker Jones Lang LaSalle ("JLL") contacted the authorized

representative of CP Acquisition, Roys Poyiadjis ("Mr. Poyiadjis"), and the members and authorized representatives of ROK, Sergio Rok ("Mr. Rok") and Michael Sperling ("Mr. Sperling"), to propose that ROK become partner of CP Acquisition in acquiring the assets and business of the Hotel.

22.     Consequently, CP Acquisition's representatives began negotiating with Mr. Rok and Mr. Sperling, as authorized representatives of ROK, to form a joint venture with the purpose of acquiring the Hotel from Posadas.

23.     Thus, in or around October 2019, Mr. Poyiadjis shared with Mr. Sperling market studies, market projections, market analyses and cash flow projections, improvements plans, and certain estimates of financial performance of the Hotel. All of this valuable business information was provided in furtherance of the business opportunity that CP Acquisition was contemplating to pursue jointly with ROK.

24.     CP Acquisition and ROK never entered into a final agreement concerning the contemplated joint venture stated in paragraph 21 above. However, CP Acquisition's authorized representatives continued their discussions with Mr. Rok, Mr. Sperling and ROK's legal counsel, to determine if ROK and CP Acquisition could purchase Parcels A and B and the ongoing operation of the Hotel separately – with CP Acquisition buying the part of the property adjoining the Atlantic Ocean and ROK acquiring the part adjoining the Condado Lagoon.

25.     Thus, on October 29, 2019, Mr. Rok sent CP Acquisition's authorized representative, Mr. Poyiadjis, a proposed Memorandum of Understanding ("MOU") with the purpose of serving as a framework for the parties' contemplated deal of segregating the Hotel into two (2) separate properties with different owners.

26.     The proposed MOU established, *inter alia*, that ROK had an interest in purchasing all the rights and entitlements to the land and improvements of the Lagoon Tower (located in Parcel B) which, among other things, consists of two hundred forty (240) hotel rooms, the right to use and maintenance of the skybridge that connects Lagoon Tower with the Ocean Tower and the right to share the use of the leased parking.

27.     The proposed MOU also provided that ROK would acquire the Lagoon Tower from CP Acquisition for SIXTEEN MILLION EIGHT HUNDRED THOUSAND DOLLARS ($16,800,000.00). Of this sum, ROK would post a cash deposit of ONE MILLION SEVEN HUNDRED THOUSAND DOLLARS ($1,700,000.00) upon the parties' execution of the purchase and sale agreement. The remainder would be paid in cash at closing.

28.     As a condition for the closing of the sale, ROK required that: (1) the title to the Lagoon Tower be free from liens and encumbrances; (2) the Lagoon Tower have adequate parking to operate as a separate hotel; (3) the Hotel franchise and management contracts were bifurcated in order to operate the Oceanfront Tower and the Lagoon Tower as separate hotels; (4) the collective bargaining agreement of the hotel's union employees and related matters be resolved to the satisfaction of the parties; and (5) ROK could submit a timely qualifying application for tax exemptions under the Puerto Rico Tourism Development Act, Act No. 74 of July 10, 2010 ("Act 74-2010") (the "Lagoon Assets").

29.     The closing of the purchase and sale transaction between CP Acquisition and ROK would be contemporaneous to the closing of the purchase and sale transaction whereby CP Acquisition would purchase Parcels A and B and the going concern of the Hotel from Posadas. In other words, CP Acquisition would purchase the Hotel's real property and the ongoing business operations thereof from Posadas, and immediately sell the Lagoon Assets to ROK.

30.     Thus, on November 5, 2019, Mr. Rok shared with CP Acquisition's authorized representative, Mr. Poyiadjis, certain title studies over Parcels A and B and represented that there would be "no issue separating the properties."

31.     Thereafter, having sustained several conversations, Mr. Rok and Mr. Poyiadjis agreed to meet at the Hotel on November 11, 2019 to see the property. Mr. Poyiadjis had also arranged for the head of the engineering of the Hotel to assist in the evaluation of the Property.

32.     Thus, on November 11, 2020, Mr. Poyiadjis, on behalf CP Acquisition, met at the Property with Mr. Rok, Mr. Sperling, a representative from JLL, and with Mr. Rok's cousins Mark and Jeff Berezdivin (hereinafter, "M. Berezdivin" and "J. Berezdivin" and jointly "Messrs. Berezdivin") where the parties were able to tour and evaluate the Property as part of their negotiations. Mr. Rok introduced Mr. Poyiadjis to Messrs. Berezdivin as potential investors in the envisioned business venture in which ROK would purchase the Lagoon Tower from CP Acquisition upon the latter acquiring the same from Posadas.

33.     After touring the Property, ROK's representatives, including Messrs. Berezdivin, had dinner with Mr. Poyiadjis the evening of November 11, 2019, at a restaurant in San Juan, wherein they further discussed their envisioned business deal. All of ROK's agents, including Messrs. Berezdivin, represented to Mr. Poyiadjis that they were very interested in reaching a final deal on the Lagoon Tower. As such, the parties decided to continue their discussions in the following weeks.

34.     Thereupon, and after extensive negotiations, on or around November 20, 2019, Posadas and CP Acquisition entered into an *Agreement of Purchase and Sale* (the "Purchase Agreement") under which CP Acquisition agreed to acquire the legal title of Parcels A and B from Posadas; the Hotel and the improvements described in the Purchase Agreement; all assets

related to the Hotel's operations, including all movable property and transferable licenses and permits; and Posadas' rights over certain lease agreements (hereinafter, collectively described as the "Property") for the agreed upon price of THIRTY ONE MILLION DOLLARS ($31,000,000.00). The Purchase Agreement included the transfer of the going concern of the Hotel.

35.     Posadas and CP Acquisition agreed that on or before the execution of the Purchase Agreement, CP Acquisition would transfer to Fidelity National Title Insurance Company ("Fidelity") the agreed sum of THREE MILLION, ONE HUNDRED THOUSAND DOLLARS ($3,100,000.00) plus an extension deposit (if applicable) of ONE MILLION DOLLARS ($1,000,000.00), to be deposited by Fidelity in an escrow account (hereinafter, the "Deposit").

36.     Hence, pursuant to the Purchase Agreement and in accordance therewith, CP Acquisition transferred the total sum of $4.1 million to Fidelity as Deposit (including the original and extension deposit).  The Purchase Agreement provides that the Deposit would be credited to the total purchase price payable at closing. If the closing did not take place on the agreed upon date, however, the Deposit would not be refunded to CP Acquisition.

37.     The day after Posadas and CP Acquisition executed the Purchase Agreement, Mr. Rok contacted Mr. Poyiadjis to congratulate him on having entered into the same and invited Mr. Poyiadjis to chat later on. Thus, the authorized representatives of CP Acquisition and ROK continued conversations with the aim of said companies jointly acquiring the Hotel pursuant to the deal that they had been contemplating and discussing since October 2019.

38.     As of November 2019, CP Acquisition had been in discussions with several potential co-investors, including Fortress Investment Group LLC and Fortress Credit Advisors

LLC (jointly, "Fortress") and Tishman Construction Corporation of Puerto Rico ("Tishman"). However, given the assurances and representations of ROK and its agents that they were seriously committed to entering into a deal to acquire the Lagoon Tower from CP Acquisition, the latter centered its efforts in its negotiations with ROK, Mr. Rok, Mr. Sperling and Messrs. Berezdivin to attain that common goal.

39.     In good faith, as part of their negotiations and in furtherance thereof, Mr. Poyiadjis shared with Mr. Rok and with Mr. Sperling valuable confidential business analyses and projections that CP Acquisitions had commissioned concerning the Hotel's present and future operation and profitability.

40.     For instance, on January 13, 2020, Mr. Poyiadjis contacted Mr. Sperling to provide him with certain information regarding how the tax exemptions operated under the Puerto Rico Tourism Development Act, Act No. 74 of July 10, 2010 ("Act 74-2010") and its predecessor, the Tourism Development Law of Puerto Rico, Act No. 78 of September 10, 1993 ("Act No. 78") (jointly, the "Tourism Laws") and how the tax exemptions were calculated.

41.     The following day, at Mr. Sperling's request, Mr. Poyiadjis sent ROK the terms of the proposal and projections to operate the Hotel under the Hilton Garden Inn brand. Mr. Poyiadjis specifically requested that ROK not share the information provided with third parties.

42.     On January 15, 2020, Mr. Poyiadjis forwarded to Mr. Sperling the Marriott brand proposal with the performance projections and terms for the operation of the Hotel.

43.     Then, on February 1, 2020, Mr. Poyiadjis sent Mr. Sperling several reports that had been commissioned related to the conditions of the Property, environmental studies, and seismic risks of the same.

44.     All the information related to the Hotel, including but not limited to business projections, operator proposals, information on tax exemptions, and the commissioned reports on the conditions of the Property, environmental studies, and seismic risks that Mr. Poyiadjis provided Mr. Rok and Mr. Sperling on behalf of CP Acquisitions was shared with them in good faith and to advance the negotiations aimed at ROK's purchase of the Lagoon Assets from CP Acquisition.

45.     The closing between Posadas and CP Acquisition was originally scheduled for December 31, 2019. However, the Purchase Agreement contemplates that said date could be extended by written agreement between the parties, until February 28, 2020 or a later date – which, as alleged and described below, ultimately occurred.

46.     Posadas operated the Hotel under certain tax exemptions, including a tax concession granted by the Puerto Rico Tourism Company ("Tourism Company"), under the Tourism Laws.

47.     Contractually, Posadas had the obligation to maintain the Hotel operating in substantially the same conditions as it was operating during the three months prior to the parties' execution of the Purchase Agreement up until the closing date. Under the Purchase Agreement, Posadas also had the obligation to transfer the Hotel's going concern to CP Acquisition upon closing and to transfer to CP Acquisition, on or before the closing date, the Tourism Company's tax concession. CP Acquisition, in turn, could subsequently obtain another tax concession from the Tourism Company.

48.     However, the closing date was postponed because, among other reasons, as of the original closing date of December 31, 2020, Posadas had not obtained the tax concession of the Tourism Company, which it had allowed to expire. Thus, on February 28, 2020, Posadas and CP

Acquisition amended the Purchase Agreement in writing to extend the original closing date to March 6, 2020 (the "First Extension").

49.     On or around February 28, 2020, CP Acquisition assigned its rights under the Purchase Agreement to its subsidiaries Condado Plaza Acquisition Lagoon, LLC ("CP Lagoon") and Condado Plaza Acquisition Ocean, LLC (jointly with CP Lagoon the "CP Subsidiaries"). However, all of CP Acquisition's obligations to Posadas under the Purchase Agreement remained in full force and effect.

50.     Meanwhile, the authorized representatives of CP Acquisition and ROK continued to negotiate and discuss the terms under which ROK would acquire the Lagoon Assets from CP Acquisition. Thereupon, in or around February 26, 2020, ROK incorporated Flamboyan Hotel, a company that ROK would use as a vehicle to acquire the Lagoon Assets.

51.     Throughout February 2020, ROK's and CP Acquisition's respective representatives and legal counsel exchanged drafts of a purchase and sales agreement, detailing the terms of the transaction between CP Acquisition and ROK/Flamboyan Hotel.

52.     The draft Agreement of Purchase and Sale exchanged between CP Acquisition and Flamboyan Hotel (hereinafter, the "Draft Lagoon Tower Contract") contemplated that Flamboyan Hotel would acquire the Lagoon Tower simultaneously with the closing of the transaction between CP Acquisition and Posadas.

53.     According to the Draft Lagoon Tower Contract, upon completion of the closing with Posadas, CP Acquisition would transfer to Flamboyan Hotel one hundred percent (100%) of its membership interest over CP Lagoon. As such, all assets of the Lagoon Tower (which CP Acquisition would have assigned to CP Lagoon) would be transferred to ROK/Flamboyan Hotel upon closing.

54.     The Draft Lagoon Tower Contract further contemplated that upon acquiring CP Acquisition's membership interest over CP Ocean ROK/Flamboyan Hotel would acquire: (a) all assets related to the operation of the Lagoon Tower, including books and records related exclusively to the Ownership of the Lagoon Tower, client files, the client list, and reservations, and the rights over future reservations; (b) all mobile property used in the operation of the Lagoon Tower, including, for example, food, beverages, and engineering, office, maintenance, and cleaning equipment, etc.; (c) all transferable licenses and permits that are necessary to operate the Lagoon Tower; (d) all leases of premises and deposits in possession of CP Acquisition pertaining to those leases; and (e) all transferable equipment leases.

55.     The Draft Lagoon Tower Contract included a provision specifically recognizing that time was of the essence with respect to the parties' obligations under the agreement. CP Acquisition and Flamboyan Hotel had included this provision because the monies that ROK would transfer upon execution of the agreement was to be used by CP Acquisition as supplemental financing for its own closing under the Purchase Agreement with Posadas.

56.     After extensive negotiations between Mr. Rok, Mr. Sperling and Messrs. Berezdivin, on one hand and Mr. Poyiadjis on the other hand, by March 3, 2020, CP Acquisition and ROK had agreed that Flamboyan Hotel would acquire the Lagoon Tower and the going concern thereof for the agreed upon price of TWENTY MILLION DOLLARS ($20,000,000.00). The parties had also agreed that on or before March 5, 2020, ROK/Flamboyan Hotel would deliver in cash, via wire transfer, the entire $20 million (the "Earnest Money") by The Title Security Group, as escrow agent.

57.     Thus, on March 4, 2020, CP Acquisition's legal counsel sent to ROK/Flamboyan Hotel's legal counsel the Execution Version of the Lagoon Tower Contract and an Execution

14

Version of the escrow agreement. *See* Exhibits 1-2. Having been led to believe that ROK/Flamboyan had the wherewithal to transfer the $20 million earnest money, as agreed upon by the parties, that same day an authorized representative of CP Acquisition signed the Lagoon Tower Contract, which counterpart was sent to ROK/Flamboyan Hotel's authorized representatives, as well as the Escrow Agreement. *See* Exhibits 3-4.

58.     However, even though the parties had firmly agreed on a $20 million purchase price for the Lagoon Tower purchase transaction, on March 4, 2020 – that is, two days before CP Acquisition's scheduled closing with Posadas – the representatives of ROK and Flamboyan Hotel contacted the representatives of CP Acquisition to inform that ROK/Flamboyan Hotel was only willing to pay SIXTEEN MILLION DOLLARS ($16,000,000.00).

59.     Mr. Rok, Mr. Sperling, Messrs. Berezdivin, ROK, and Flamboyan Hotel knew that CP Acquisition was counting on the Earnest Money to close its deal with Posadas because the Earnest Money was to be used to partially finance the purchase of the Property.

60.     Thus, Mr. Rok, Mr. Sperling, Messrs. Berezdivin, ROK, and Flamboyan Hotel were well aware that their sudden backpedaling on the eve of CP Acquisition's closing with Posadas – which under the First Extension was scheduled to take place on March 6, 2020 – could potentially jeopardize CP Acquisition's ability to timely close on the sale of the Property and would expose CP Acquisition, not only to lose the Property, but also the $4.1 Deposit that CP Acquisition had advanced to Posadas and was being held in escrow by Fidelity.

61.     Had CP Acquisition known that ROK/Flamboyan Hotel was going to renege on its deal over the Lagoon Tower and refuse to sign the Lagoon Tower Contract under the terms previously agreed to by the parties, CP Acquisition would have entertained alternative debt financing options/deals with other potential co-investors – including, but not limited to Fortress

and Tishman – or its parent company could have liquidated assets of its own that were tied up in other properties in order for CP Acquisition to timely close the sale with Posadas on March 6, 2020, as contemplated under the First Extension.

62.     However, because it was led to believe by Mr. Rok, Mr. Sperling, Messrs. Berezdivin, ROK, and Flamboyan Hotel that they were going to execute the Lagoon Tower Contract on March 4, 2020, transfer the Earnest Money the next day to be deposited in escrow, and close its deal over the Lagoon Tower simultaneously with CP Acquisition's closing with Posadas on March 6, 2020, CP Acquisition did not pursue those other financing alternatives with sufficient time to be able to close with Posadas on March 6, 2020. Therefore, CP Acquisition was forced to negotiate an extension of its own closing with Posadas.

63.     For its part, Posadas demanded that CP Acquisition transfer an additional ONE MILLION DOLLARS ($1,000,000.00) to Fidelity, to be added to the Deposit, before agreeing to the additional extension.

64.     Therefore, on March 5, 2020, Posadas, CP Acquisition, and the CP Subsidiaries jointly executed a second amendment to the purchase agreement (the "Second Extension") pursuant to which the closing date was postponed to March 17, 2020. In addition, CP Acquisition agreed to transfer an additional ONE MILLION DOLLARS ($1,000,000.00) to Fidelity to be added to the Deposit, which, in turn, would be credited to the purchase price on the closing date. Thus, on the same date that the Second Extension was executed, CP Acquisition transferred to Fidelity the agreed upon amount of $1 million to be added to the Deposit.

65.     As a result, Fidelity currently holds in escrow a total Deposit of $5.1 million, which includes the originally agreed upon sum of THREE MILLION, ONE HUNDRED THOUSAND DOLLARS ($3,100,000.00), the original extension deposit of ONE MILLION

DOLLARS ($1,000,000.00), plus the ONE MILLION DOLLARS ($1,000,000.00) that were added to the extension deposit pursuant to the Second Extension.

66.     As stated, under the Second Extension the closing between Posadas and CP Acquisition was scheduled for March 17, 2020. However, on Sunday, March 15, 2020, the Governor of Puerto Rico issued Administrative Bulletin No. OE-2020-023 (hereinafter, the "Executive Order") in an attempt to curtail the spread of COVID-19. By means of the Executive Order and in light of the existing public health threat, the Governor closed all non-essential businesses and imposed a curfew for all citizens from March 15, 2020 to March 30, 2020, under which everyone had to remain in their homes.

67.     Given the restrictions imposed by the Executive Order and the fact that purchase and sale transactions require unity of act pursuant to the Puerto Rico Notarial Act, it became obvious that the closing would not be able to take place on the scheduled date. Therefore, between March 16 and March 17, 2020, CP Acquisition and Posadas's respective representatives engaged in negotiations to further extend the closing date.

68.     On March 16, 2020, Mr. Rok and Mr. Poyiadjis exchanged various text messages. Mr. Rok asked Mr. Poyiadjis about ROK's $16 million offer. Mr. Poyiadjis asked Mr. Rok whether the $16 million offer is still valid because "a lot [had] changed [during the] weekend." Mr. Rok responded that it is, but he needed to know the status of the extension (meaning the extension of CP Acquisition's closing with Posadas). Mr. Rok asked Mr. Poyiadjis to have his attorneys' revise the Draft Lagoon Contract to reflect the new purchase price.

69.     The morning of March 17, 2020, Mr. Rok once again asked Mr. Poyiadjis about the status of the negotiations concerning the extension of the closing date, because he needed to

get ready for closing. He also requested that CP Acquisition send him the revised Draft Lagoon Contract.

70.     Since the extension Posadas was willing to agree upon only extended to March 17, 2020, and given the challenges in obtaining supplemental financing on such short notice – particularly, given the closing of non-essential businesses in Puerto Rico and the uncertainty created by the COVID-19 pandemic – CP Acquisition decided to accept the reduced $16 million purchase price that ROK/Flamboyan Hotel had offered for the Lagoon Tower transaction.

71.     Thus, on March 17, 2020, the former Execution Version of the Lagoon Tower Contract was modified to reflect that the purchase price for the Lagoon Tower and the going concern thereof would be SIXTEEN MILLION DOLLARS ($16,000,000.00). The revised contract was sent to ROK/Flamboyan Hotel's representatives.

72.     The revised Lagoon Tower Contract provides that on or before March 19, 2020, Flamboyan Hotel would transfer the amount of SIXTEEN MILLION DOLLARS ($16,000,000.00) to The Title Security Group to be deposited in an escrow account. It was understood by the parties that said amount would, in turn, be used by CP Acquisition to pay part of the purchase price under its Purchase Agreement with Posadas. Thus, if ROK/Flamboyan Hotel reneged on their deal, CP Acquisition would likely lose the $5.1 million Deposit to Posadas given that, because of the great uncertainty caused by the COVID-19 crisis and its virtual destruction of the tourism industry in Puerto Rico and around the world, it would be virtually impossible for CP Acquisition to acquire supplemental financing elsewhere or for its parent company to liquidate enough assets on or before the extended closing date CP Acquisition was negotiating with Posadas.

73.     Finally, on March 17, 2020, Posadas, CP Acquisition and the CP Subsidiaries jointly executed a third amendment to the purchase agreement (the "Third Extension"). Under the Third Extension, the parties agreed that closing would take place on April 17, 2020 or five (5) business days after the Government announced the resumption of operations of the Registry of Property, as well as the reopening of law firms and notary public offices in San Juan, whichever date was later. In any case, per the Third Extension, the closing had to take place no later than July 31, 2020.

74.     Posadas was well aware of the terms of the negotiations between ROK/Flamboyan Hotel and CP Acquisitions not only because all parties shared the same real estate broker, JLL, but also because Mr. Poyiadjis had informed Posadas' authorized representative, Byron Blount, about them.

75.     In fact, on March 23, 2020, Mr. Blount contacted Mr. Poyiadjis via e-mail to inquire if CP Acquisition had formalized the deal with Mr. Rok regarding the Lagoon Tower. Likewise, he indicated that Posadas was considering temporarily suspending the Hotel's operations as other resorts had done following the Government imposed lockdown and that, should it decide to close, it would formally notify CP Acquisition.

76.     Mr. Poyiadjis responded that they were forced to go back over the terms of the purchase agreement with ROK, in part because the COVID-19 pandemic prompted Mr. Rok to question closing costs and pension plan liability exposure, among other matters.

77.     Mr. Blount replied encouraging Mr. Poyiadjis to continue negotiating with them (referring to Mr. Rok and his companies), but also expressed that, in any case, JLL could refer him to local financing options.

78.     On March 20, 2020, counsel for ROK/Flamboyan Hotel communicated to counsel for CP Acquisition that Mr. Rok was ready to sign the Lagoon Tower Contract – which stipulated a purchase price of SIXTEEN MILLION DOLLARS ($16,000,000.00) – and fund the escrow account as provided in his attorney's last revisions to the agreement concerning the funding of that account.

79.     On March 26, 2020, JLL's representative sent Mr. Poyiadjis an analysis/report on the then current situation of the Hotel, key contingency actions in place, the impact the COVID-19 pandemic had had on the Hotel's operations, and projections based on whether the Hotel would remain open under a "low occupancy model" or if it were closed under a "suspension model," among other information. According to the analysis sent by JLL, under the suspension model, the Hotel was projected to lose, at least, $5.4 million dollars between April and June 2020.

80.     On March 30, 2020, JLL's representative sent Mr. Poyiadjis additional updated information on projections on the Hotel's operations, taking into account the potential impact of the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act, economic stimulus bill passed by Congress and signed into law on March 27, 2020 in response to the economic fallout of the COVID-19 pandemic in the United States.

81.     Mr. Poyiadjis, in good faith, shared with ROK/Flamboyan Hotel's representatives all information that JLL sent him concerning the impact the pandemic had had and was expected to have on the Hotel's operations.

82.     Thus, in early April 2020, ROK/Flamboyan Hotel's representatives together with Mr. Poyiadjis continued to discuss the scenarios under which the parties' deal would still make sense money wise. During those discussions, Mr. Rok informed Mr. Poyiadjis that

ROK/Flamboyan Hotel now wished to further lower the purchase price for the Lagoon Tower and its going concern to THIRTEEN MILLION DOLLARS ($13,000,000.00).

83.     Mr. Poyiadjis informed JLL's representative – who was brokering the both the Posadas/CP Acquisition deal and the ROK/Flamboyan/CP Acquisition deal – about ROK/Flamboyan's new reduced purchase price offer for the Lagoon Tower transaction.

84.     Given that ROK/Flamboyan Hotel had twice reneged on their previous agreements concerning the Lagoon Tower and the fact that the Hotel was projected to lose at least $5.4 million between April and June 2020 – which losses would have to be assumed by CP Acquisition upon closing – JLL encouraged Mr. Poyiadjis to negotiate with Posadas to see if the latter would agree to reduce the purchase price. Thus, on April 8, 2020, Mr. Poyiadjis contacted Mr. Blount by email and proposed, as an initial offer, that the purchase price under the Purchase Agreement be reduced to $16 million dollars. This offer contemplated the fact that the value of the Property, including the Hotel's goodwill, had been so drastically reduced as a result of the pandemic, that the fundamental purpose of the transaction with Posadas had been altered and the value of the Property was no longer consistent with the $31 million purchase price.

85.     Mr. Blount initially replied that the offer was not attractive and that it was preferable to keep the Deposit and sell the Property to another buyer. In addition, he indicated that, for Posadas to consider a reduction in the purchase price, CP Acquisition's offer must be substantially greater than the proposed $16 million, and invited Mr. Poyiadjis to reconsider the offer and proposed having a phone conversation that same afternoon.

86.     However, several days later, Mr. Blount wrote to Mr. Poyiadjis to advise that, having further discussed it internally and with counsel, Posadas reaffirmed that it would not change the terms of the Purchase Agreement and that the parties should close as agreed therein.

87.     Following a series of unfruitful conversations with CP Acquisition's attorneys and authorized representatives, Mr. Rok, Mr. Sperling, Messrs. Berezdivin, ROK, and Flamboyan Hotel unreasonably reneged on the deal to purchase the Lagoon Tower despite the fact that they had led Mr. Poyiadjis and CP Acquisition to believe that ROK/Flamboyan Hotel were committed to the deal the parties had decidedly reached by March 4, 2020.

88.     After issuing several executive orders extending the curfew and the order to close non-essential businesses and establishments with few limited exceptions, on May 1, 2020, the Governor issued Executive Order OE-2020-038, allowing the gradual reopening of some businesses, including, "notary [services] for all types of transactions that are required in the ordinary course of business." *Id.*

89.     Given that Executive Order OE-2020-038 exempted notary services from the lockdown order, on May 4, 2020, Posadas sent a letter to Plaintiffs demanding that they appear on Monday, May 11, 2020 at 1:00 pm at the offices of their attorneys in San Juan, O'Neill & Borges, to close the deal.

90.     CP Acquisition, however, knew that, as of May 11, 2020, Posadas was not in a position to comply with its own obligations under the Purchase Agreement, because Posadas could not deliver the benefit of the bargain—that is, the operation of the Hotel in substantially the same condition as it was operating during the three months prior to the execution of the Purchase Agreement, a viable going concern, and substantial goodwill.

91.     Hotel occupancy for the months of November 2019, December 2019, and January 2020 was 29.6%, 38.6%, and 41.4%, respectively; while the average occupancy of the Hotel for the year ended on December 31, 2018 was 40.2%.

92.     In contrast, upon information and belief, as of May 11, 2020, Hotel occupancy was almost at zero percent (0%) because of the pandemic; as of April 20, 2020, Posadas had closed the Lagoon Tower; had a couple of rooms occupied in the Oceanfront Tower; had furloughed most of the Hotel's employees; and had only kept the bare minimum staff necessary to safeguard the facilities. Posadas also stopped operating and closed all the Hotel's food and beverage establishments. Therefore, and given that Posadas had threatened to terminate the Purchase Agreement and keep the Deposit if CP Acquisition did not close on May 11, 2020 – and given that all New York State Courts were closed to commercial actions due to the pandemic – CP Acquisition filed a preemptive declaratory judgment action and sought a preliminary injunction against Posadas before the Puerto Rico Court of First Instance.

93.     For its part, since CP Acquisition did not close on May 11, 2020, via letter dated May 11, 2020, Posadas declared the Purchase Agreement terminated. Ever since, Posadas and CP Acquisition and the CP Subsidiaries have been subsumed in litigation in which Posadas alleges that CP Acquisition breached the Purchase Agreement by failing to close on May 11, 2020 and that, thus, it is entitled to retain the $5.1 million Deposit. CP Acquisition has denied that it breached the Purchase Agreement because, at the time Posadas was demanding closing, it could not deliver the benefit of the bargain. That contractual dispute is currently pending resolution before the New York Supreme Court.

94.     Meanwhile, Posadas offered to sell the Hotel to other buyers. The authorized agents of ROK and Flamboyan Hotel were among the persons and entities to whom Posadas offered to sell the Property.

95.     Upon information and belief, in or around October 2020, ROK, Mr. Rok, Mr. Sperling, and Messrs. Berezdivin created a series of limited liability companies in Puerto Rico

with the purpose of acquiring the Property. These companies are defendants: Condado Plaza Investments, ROK CPH Ocean, ROK CPH Lagoon, CPH Ocean, CPH Lagoon, and CPH Flamboyan (collectively, the "ROK Companies").

96.     On November 9, 2020, CP Acquisition learned that Posadas entered into a purchase agreement to sell the Hotel to one or more of the ROK Companies. Upon information and belief, the sale price agreed between Posadas and the ROK Companies is less than the THIRTY-ONE MILLION DOLLARS ($31,000,000.00) agreed by Posadas and CP Acquisition in the Purchase Agreement. The closing under that new purchase agreement was scheduled for December 10, 2020.

97.     The ROK Companies entered into a new purchase agreement with Posadas to acquire the Property with full knowledge of CP Acquisition's Purchase Agreement with Posadas. Indeed, ROK, Mr. Rok, Mr. Sperling, and Messrs. Berezdivin had agreed to acquire the Lagoon Tower from CP Acquisition through Flamboyan Hotel in a transaction that should have taken place simultaneously with CP Acquisition's closing with Posadas.

98.     ROK, Mr. Rok, and Mr. Sperling obtained critical confidential and proprietary business information about the Property through the negotiations they carried out with CP Acquisition's authorized representatives when the former were pursuing the purchase of the Lagoon Tower from CP Acquisition, which, in turn, they shared with Messrs. Berezdivin.

99.     Upon information and belief, ROK, Mr. Rok, Mr. Sperling and Messrs. Berezdivin have used CP Acquisition's confidential and proprietary business information in furtherance of the ROK Companies' new deal with Posadas to the detriment and in breach of the good faith expectations of CP Acquisition, which shared said information with ROK, Mr. Rok,

and Mr. Sperling with the expectation that it would only be used for the contemplated transaction between CP Acquisition and ROK/Flamboyan Hotel.

100.    Thus, all defendants benefited from the confidential and proprietary business information that CP Acquisition provided to ROK, Mr. Rok, and Mr. Sperling in good faith during the course of their negotiations, and subsequently used it to their advantage in negotiating their own purchase agreement to acquire the entire Property from Posadas.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### *CULPA IN CONTRAHENDO*

101.    CP Acquisition realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 100.

102.    Pursuant to Puerto Rico law, "nobody is under obligation to enter into a contract. […] Preliminary negotiations, however, generate a social relationship that imposes on the parties the duty to act in good faith, which, as Díez-Picazo has correctly observed, 'does not only govern legal relationships already established, but also those derived from a simple social contract'." *Prods. Tommy Muñiz v. COPAN*, 13 P.R. Offic. Trans. 664, 676 (1982).

103.    The "unjustified interruption of negotiations [i]s illegal because it constitutes a breach of the good faith […] [which] imposes on the parties a duty of mutual loyalty in the negotiations." *Prods. Tommy Muñiz*, 13 P.R. Offic. Trans. at 677.

104.    The unjustified interruption of negotiations constitutes an illegal act that can give rise to tort liability under the so-called *culpa in contrahendo* doctrine. *Perfect Cleaning v. Cardiovascular*, 172 D.P.R. 139, 144-145 (2007).

105.    *Culpa in contrahendo* is an obligation towards a specific person, which arises at that moment during the course of negotiations in which the exercise of the right of a party to

withdraw activates the protection of the trust placed by the other party in the withdrawing party and is contrary to the principle of good faith. *P.R.F.S. v. Promoexport*, 187 D.P.R. 42, 58 (2012).

106.    *Culpa in contrahendo* is not only recognized when one of the parties that intervened in the formation of a contract acts with intentional malice ("*dolo*"), fraud, or abuse of law, but also when it acts negligently, causing harm. *Colón v. Glamorous Nails*, 167 D.P.R. 33, 46 (2006).

107.    In order to determine whether the interruption of the precontractual negotiations is unjustified or arbitrary, "it is necessary to examine the circumstances of the interruption, specifically: (1) the development of the negotiations; (2) how did they begin; (3) their course; (4) the conduct of the parties throughout them; (5) the stage at which the interruption took place; and (6) the parties' reasonable expectations to form a contract, as well as any other relevant circumstance under the facts of the case submitted to judicial scrutiny." *Prods. Tommy Muñiz*, 13 P.R. Offic. Trans. at 680.

108.    The duty to compensate and redress the culpable breach of preliminary deals reaches the reparation of the expenses suffered and the patrimonial losses derived from the arbitrary proceeding of the party that incurs in fault. *Colón v. Glamorous Nails*, 167 D.P.R. at 58.

109.    ROK, Flamboyan Hotel, Mr. Rok, Mr. Sperling and Messrs. Berezdivin had an obligation to conduct themselves in good faith during the negotiations of the sales transaction they had agreed upon with CP Acquisition regarding the Lagoon Tower.

110.    CP Acquisitions had extensive negotiations with ROK, Flamboyan Hotel, Mr. Rok, Mr. Sperling and Messrs. Berezdivin concerning ROK/Flamboyan Hotel's purchase of the Lagoon Tower and had reached a verbal agreement to that effect by March 3, 2020.

111.    As of that date, the parties had a definite agreement on the purchase price for the Lagoon Tower transaction and had agreed that ROK/Flamboyan Hotel would transfer the $20 million Earnest Money to The Title Security Group on March 5, 2020, to be kept in escrow. The parties had also agreed on all terms and conditions of their deal and even exchanged an Execution Versions of the Lagoon Tower Contract and the Escrow Agreement, both of which CP Acquisition signed on March 4, 2020. *See* Exhibits 1-4. However, ROK, Flamboyan Hotel, Mr. Rok, Mr. Sterling and Messrs. Berezdivin arbitrarily and unjustifiably reneged on their commitment to execute the Lagoon Tower Contract.

112.    CP Acquisition relied in good faith on ROK, Flamboyan Hotel, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's representations that their intent was to purchase CP Acquisition's membership interest over CP Lagoon and, thus, the Lagoon Tower from CP Acquisition, that they had the resources to do so, and that $20 million was an acceptable purchase price.

113.    Since the transaction between ROK and CP Acquisition was meant to provide part of the financing for CP Acquisition's closing with Posadas, when ROK/Flamboyan Hotel reneged on the deal to acquire the Lagoon Tower just two days before the scheduled closing date under the First Extension (*i.e.*, March 6, 2020), CP Acquisition was left without enough liquid assets to close the deal with Posadas prior to the pandemic wreaking havoc on the tourism and hospitality industry.

114.    CP Acquisition had the reasonable expectation that ROK/Flamboyan Hotel would execute the Lagoon Tower Contract on March 4, 2020 and close the deal for the purchase of the Lagoon Tower from CP Acquisition simultaneously with CP Acquisition's closing with Posadas under the First Extension on March 6, 2020. Indeed, on March 4, 2020, CP Acquisition's and

ROK/Flamboyan Hotel's respective legal counsel had exchanged the Execution Version of the Lagoon Tower Contract and an Execution Version of the escrow agreement and, on that same date, CP Acquisition's authorized representative signed a counterpart of the contract's signature page and the Escrow Agreement.

115.    ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's unjustified, arbitrary and bad faith refusal to execute the Lagoon Tower Contract at the eleventh hour constitutes a breach of the good faith and loyalty owed by the parties during the negotiations.

116.    ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's unjustified, arbitrary and bad faith refusal to execute the Lagoon Tower Contract has caused and will continue to cause damage to Plaintiff insofar as it prevented CP Acquisition from having entered into deals with other potential co-investors and from exploring other financing options with sufficient time to close the deal with Posadas pursuant to the First Extension on the scheduled closing date of March 6, 2020.

117.    Moreover, when ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's unjustifiably and arbitrarily refused to execute the Lagoon Tower Contract on March 4, 2020, CP Acquisition was forced to negotiate a Second Extension with Posadas in which CP Acquisition was also forced to add $1 million to the Deposit.

118.    ROK/Flamboyan Hotel's arbitrary withdrawal from the deal on March 4, 2020, also contributed to CP Acquisition not being able to close the purchase of the Property with Posadas prior to the pandemic's virtual destruction of the hospitality and tourism industry and prompted Posadas' filing of a lawsuit against CP Acquisition for breach of contract, which suit is still pending.

119.     Should Posadas prevail in the referenced New York legal action, CP Acquisition will lose the $5.1 million Deposit, all because of ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's unjustified and arbitrary decision to withdraw from the agreed upon deal they had made with CP Acquisition.

120.     CP Acquisition has also spent hundreds of thousands of dollars in legal fees – first, in conducting the due diligence in anticipation for the transaction with Posadas and ROK/Flamboyan Hotel and, later, in its litigations with Posadas – which it would not have spent or lost had it not been for ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's tortious and bad faith conduct.

121.     Therefore, CP Acquisition asks that the Court declare ROK/Flamboyan Hotel's, Mr. Rok, Mr. Sperling and Messrs. Berezdivin's conduct to constitute *culpa in contrahendo* and consequently, that they must compensate CP Acquisition for all the damages caused by their tortious conduct, which are estimated to be no less than $10,000,000.00.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE INDUSTRIAL
### AND TRADE SECRET PROTECTION ACT OF PUERTO RICO

122.     CP Acquisition realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 121.

123.     The Industrial Trade Secret Protection Act of Puerto Rico, Act No. 80 of June 3, 2011 ("Act 80-2011"), 10 P.R. Laws Ann. §§ 4131-4141, recognizes the commercial value of trade secrets and the damages that companies can suffer if their trade secrets and confidential commercial business information is misappropriated and illegally disclosed.

124.     Indeed, the Statement of Motives of Act 80-2011 recognizes that commercial secrets can be *the most valuable asset of a company*—over any real property, machinery or

vehicles—and that a company's commercial secrets can be irreplaceable. *See* Act 80-2011, Statement of Motives.

125.    The Puerto Rico Legislature further recognized that "[t]he non-protection of [commercial secrets] could leave companies at the mercy of *any competitor* or ex-employee that acquires knowledge of the same, *be it directly from the owner or by other means.*" *See* Act 80-2011, Statement of Motives (emphasis ours).

126.    Act 80-2011 provides that industrial or trade secrets are deemed to be any information:

> (a) That has a present or a potential independent financial value or that provides a business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information, and

> (b) for which reasonable security measures have been taken, as circumstances dictate, to maintain its confidentiality.

> Any information generated by, used in or resulting from any failed attempts to develop a trade secret shall also be deemed to be a part thereof.

10  P.R. Laws Ann. § 4132.

127.    CP Acquisition's confidential business records and proprietary information, including but not limited to its analyses concerning the Hotel's operations and profitability, reports on the conditions of the Property, environmental studies, and seismic risks specifically commissioned by CP Acquisition constitute industrial or trade secrets under Act 80-2011 given that, at the time said information was acquired by ROK and the individual defendants, Messrs. Rok and Sperling, it had present and potential independent financial value for the CP Acquisition, it provided ROK a business advantage, it was not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or

disclosure of such information, and because CP Acquisition had taken reasonable security measures to maintain its confidentiality.

128.    CP Acquisition only shared said confidential and proprietary information with ROK, Mr. Rok, and Mr. Sperling with the expectation that it would exclusively be used for the contemplated transaction between CP Acquisition and ROK/Flamboyan Hotel. Mr. Poyiadjis also explicitly told the Messrs. Rok and Sperling that the information he was providing was not to be shared with others.

129.    ROK, Mr. Rok, and Mr. Sperling improperly disclosed that information to the ROK Companies without obtaining CP Acquisition's consent to use said information for the ROK Companies' acquisition of the entire Property.

130.    Under Act 80-2011, "[a]ny natural or juridical person who misappropriates a trade secret shall be held accountable for any damages caused to its owner." 10 P.R. Laws Ann. § 4134. For purposes of Act 80-2011, misappropriation shall be:

> (a) The acquisition of a trade secret belonging to another by a person who knew or should have known that he/she acquired such secret directly or indirectly through improper means, or

> (b) the disclosure or use of a trade secret belonging to another without his/her express or implicit consent, by a person who:

> (1) Used improper means to gain knowledge of the trade secret, or

> (2) at the time of disclosure or use, such person knew or should have known that such trade secret was:

> (A) obtained through a person who acquired such information through the use of improper means;

> (B) obtained under circumstances from which a duty to maintain confidentiality or to limit use ensues;

> (C) obtained through a person who had the duty-bound to the trade secret's owner to maintain confidentiality or limit use […]. *Id.*

131.     ROK, Mr. Rok, and Mr. Sperling deceived CP Acquisition's representatives into facilitating to them CP Acquisition's trade secrets. They tricked Mr. Poyiadjis into believing that ROK/Flamboan Hotel would acquire the Lagoon Tower through a transaction with CP Acquisition and, thus, used improper means to gain knowledge, among other things, of the Hotel's operations and profitability reports commissioned by CP Acquisition – information that CP Acquisition had shared in confidence and good faith in furtherance of ROK's purchase of the Lagoon Tower from CP Acquisition – and leveraged that knowledge in its negotiations to purchase the Hotel directly from Posadas through the ROK Companies in violation of Act 80-2011. 10 P.R. Laws Ann. § 4134.

132.     The value of the value of the confidential and proprietary information acquired by ROK, Mr. Rok, and Mr. Sperling is estimated in no less than $500,000.00.

133.     Because ROK, Mr. Rok, and Mr. Sperling acted intentionally and with bad faith in violating their duty of loyalty to CP Acquisition in their negotiations, said defendants are responsible to the CP Acquisition for treble damages, as will be proven at trial, and a reasonable sum for attorney's fees.

134.     As provided by Act 80-2011, CP Acquisition is entitled to treble damages and attorney's fees against ROK, Mr. Rok and Mr. Sperling in addition to, and irrespective of other remedies available to CP Acquisition, whether or not based on the misappropriation of their trade secrets, and other civil remedies not based on the misappropriation of the trade secrets. 10 P.R. Laws Ann. § 4140.

### THIRD CAUSE OF ACTION:
### TORT LIABILITY UNDER ARTICLE 1802 OF THE CIVIL CODE

135.     CP Acquisition realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 134.

136.    "[T]he scope of negligence under Article 1802[1] is broad—'as broad as the behavior of human beings ... includ[ing] any fault that causes harm or injury.'" *Ríos v. Municipality of Guaynabo*, 938 F. Supp.2d 235, 260 (D.P.R. 2013) (quoting *Bonilla v. Chardón*, 18 P.R. Offic. Trans. 696, 709, 118 D.P.R. 599 (1987) and *Collón v. Romero–Barcelo*, 12 P.R. Offic. Trans. 718, 112 P.R.Dec. 573, 579 (1982)).

137.    In good faith, as part of their negotiations for ROK to acquire the Lagoon Tower from CP Acquisition and in furtherance thereof, Mr. Poyiadjis shared with ROK, Mr. Rok and with Mr. Sperling valuable confidential business analyses and projections that CP Acquisition had commissioned concerning the Hotel's present and future operation and profitability. Said information was shared with ROK, Mr. Rok and with Mr. Sperling with the understanding that it was to be used exclusively for the transaction that CP Acquisition and ROK were contemplating venturing into together.

138.    After extensive negotiations, by March 3, 2020, CP Acquisition, ROK and the individual defendants had agreed that Flamboyan Hotel would acquire CP Acquisition's membership interest over CP Lagoon and, thus, the Lagoon Tower and its going concern for the agreed upon price of TWENTY MILLION DOLLARS ($20,000,000.00).

139.    As mentioned, as of March 3, 2020, the parties had a definite agreement for the Lagoon Tower transaction and had agreed that ROK/Flamboyan Hotel would transfer the $20 million Earnest Money to The Title Security Group on March 5, 2020, to be kept in escrow. The parties had also agreed on all terms and conditions of their deal and even exchanged an Execution Version of the Lagoon Tower Contract and the Escrow Agreement, both of which CP Acquisition signed on March 4, 2020. *See* Exhibits 1-4. However, ROK, Flamboyan Hotel, Mr.

---

[1] Art. 1802 of the Puerto Rico Civil Code of 1930 applies in this case as it was still in effect during the period at issue in this Complaint.

Rok, Mr. Sterling and Messrs. Berezdivin arbitrarily and unjustifiably reneged on their commitment to execute the Lagoon Tower Contract.

140.    By reneging on their agreement and insisting on the eve of CP Acquisition's closing with Posadas that the purchase price of the Lagoon Tower be reduced to $16 million, ROK, Flamboyan Hotel, Mr. Rok, Mr. Sterling and Messrs. Berezdivin caused CP Acquisition to solicit an additional extension and to add another $1 million to the Deposit.

141.    In addition, ROK, Flamboyan Hotel, Mr. Rok, Mr. Sterling and Messrs. Berezdivin's arbitrary withdrawal from the deal over the Lagoon Tower caused the entire contemplated transactions to fall apart and have caused severe damages to CP Acquisition, including but not limited to the potential loss of the $5.1 million Deposit, due diligence costs expended by CP Acquisition in furtherance of its contemplated transaction with Posadas, and the loss of estimated future income/profits, among others.

142.    Moreover, defendants misused of CP Acquisition's confidential business analyses concerning the Hotel's operations and profitability, among others, in negotiating their own purchase agreement with Posadas constitutes unfair competition.

143.    As mentioned, the value of the value of the confidential and proprietary information acquired by ROK, Mr. Rok, and Mr. Sperling is estimated in no less than $500,000.00.

144.    Defendants' leveraged the knowledge regarding the Hotel's operations and expected profitability gained from their negotiations with CP Acquisition to purchase the Hotel directly from Posadas through the ROK Companies, thereby causing CP Acquisition to potentially lose the $5.1 Deposit and other damages, including but not limited to the costs of CP Acquisition's litigation with Posadas, among others.

145.    Defendants' intentional or negligent use of the above mentioned sensitive and confidential business information, constitutes fault or negligence as those terms are defined in Article 1802 of the Civil Code of Puerto Rico of 1930, 31 P.R. Laws Ann. § 5141, and those acts have caused and continue to cause Plaintiff to suffer the injury and damages describe above.

146.    Therefore, pursuant to said Article 1802, defendants are obligated to indemnify and repair all the damages caused to CP Acquisition, which damages are estimated to be no less than $50,000,000.00.

## VIII.

## DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Complaint be granted and that defendants be ordered to pay CP Acquisitions all damages herein claimed or an amount of not less than $61,500,000.00, plus all costs, expenses, and attorney's fees in which CP Acquisition has or will be required to incur by reason of defendants' tortious conduct and such other and further relief as is just and equitable. CP Acquisition demands a trial by jury.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 11th day of December, 2020.

s/Juan A. Marqués-Díaz
USDC-PR No. 211803
jam@mcvpr.com

s/Leslie Y. Flores-Rodríguez
USDC-PR No. 223601
lfr@mcvpr.com

McCONNELL VALDÉS LLC
P.O. Box 364225
San Juan, PR 00936-4225
Tel: 787-250-5628
Fax: 787-759-8282